# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | |
|---|---|
| SYNAGRO SOUTH, LLC | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    CASE NO. _____ |
| | ) |
| CITY OF CHATTANOOGA, TENNESSEE | ) |
| | ) |
| and | ) |
| | ) |
| KAREN STYERS, in her individual capacity | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

NOW COMES Plaintiff, Synagro South, LLC ("**Plaintiff**" or "**Synagro**"), by and through its undersigned counsel, and hereby files this Complaint for damages, injunctive relief, declaratory judgment and damages against Defendant, City of Chattanooga, Tennessee, a municipal corporation (the "**City**") and Karen Styers, individually, ("**Ms. Styers**") (collectively, the "**Defendants**") (Defendants and Plaintiff shall be referred to collectively as the "**Parties**"), for breach of contract and breach of the covenant of good faith and fair dealing. Plaintiff states and alleges as follows:

## NATURE OF THE CASE

1.      On August 17, 2021, the City published a request for proposal ("**RFP**") seeking an experienced firm to handle the transportation and disposition of biosolids generated at the Moccasin Bend Wastewater Treatment Plant ("**MBWWTP**"), which serves the City of

Chattanooga, Tennessee.  The City awarded Synagro the Contract for handling the transportation and disposition of generated at the MBWWTP.

2.  A central tenet of the Contract is that Synagro must deposit the biosolids at permitted locations generally within a 75-mile radius (with an opportunity to use sites outside that radius at a different price and with additional approval) of the MBWWTP and use its professional judgment and experience to handle the logistics, including trucks, personnel and equipment, to provide for biosolids removal, transportation and disposition.  Even though the City crafted the **RFP**, which became the Contract, to place the onus of logistics on the Contractor, the City has wrongfully micromanaged the logistics process and arbitrarily prevented Synagro from using biosolid deposit sites entirely or otherwise imposed non-legal, non-regulatory and non-contractual conditions on Synagro use of the deposit sites.  The City's conduct materially obstructs Synagro's performance and denies Synagro any benefit of the bargain.

3.  The City's administration of the Contract deviates so substantially from the contractual documents that it prepared, that when Synagro demanded mediation with the City to resolve differences, the City outright refused despite the fact that mandatory mediation is a provision of its *own* purchase agreement form.  (Attached as **Ex. A**).

4.  As a result of the City's breaches and administration of the Contract, Synagro has suffered monetary damages, including in the form an unpaid fuel surcharge, as well as incremental costs significantly exceeding those it would otherwise incur if the City abided by the Contract's terms, instead of imposing unilateral, non-legal, non-regulatory and non-contractual restrictions and conditions on Synagro that significantly increase its equipment and manpower costs.

5.  Synagro also seeks declaratory and injunctive relief requiring the City to abide by the terms of the Contract to allow Synagro to haul biosolids to any permitted field within a 75 mile

41850542.3

radius of the MBWWTP, as well as to the Copperhill Site (defined below) identified in the Contract, and to allow Synagro to use commercially reasonable discretion (within the bounds of duly promulgated laws and regulations and the express terms of the Contract) concerning when and where to spread the biosolids on permitted sites.

6.      In addition, Karen Styers, the City's biosolids coordinator has made statements to Synagro evidencing a personal agenda against Synagro in an effort to deliberately impair Synagro's ability to perform under the Contract to establish a pretextual justification for the City to terminate the Contract. Upon information and belief, Ms. Styers' unlawful actions against Synagro are motivated by her desire to replace Synagro with a contractor of her choosing, thereby allowing for the reinsertion of a friend into the biosolids-contractor relationship with the City. Because Ms. Styers' unlawful actions occurred outside of the course and scope of her employment, she is individually liable for Synagro's resulting damages.

## THE PARTIES

7.      Synagro is a Delaware entity with a principal place of business in Baltimore County, Maryland.

8.      Synagro's sole member is Synagro-WWT, Inc., which is a Maryland Corporation with a principal place of business in Middle River, Maryland.

9.      The City of Chattanooga, Tennessee is a Tennessee Municipality and Governmental Entity with a principal place of business of Chattanooga, Tennessee and can be served with process through the City Attorney, Phillip A. Noblett, at 100 East 11th Street, Suite 200, Chattanooga, Tennessee 37402.

10.     By Tennessee law, the City has the capacity to enter into contracts and to sue and be sued.

3

11.     The City operates the MBWWTP located at 455 Moccasin Bend Road, Chattanooga, Tennessee 37405.

12.     Ms. Styers is an individual residing in Tennessee and is employed by the City as a biosolids coordinator. Upon information and belief, Ms. Styers can be served with process at 455 Moccasin Bend Road, Chattanooga, Tennessee 37405.

**JURISDICTION AND VENUE**

13.     Subject matter jurisdiction is proper under 28 U.S.C.§ 1332 on the basis that complete diversity exists between Synagro and Defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Synagro is a Delaware entity owned by a Maryland corporation domiciled in Maryland. The City, a Tennessee body politic, and Ms. Styers are both domiciled in Tennessee. Additionally, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this District because all or a substantial part of the events or omissions giving rise to Synagro's claims against Chattanooga occurred within this District.

**FACTUAL ALLEGATIONS**

A.     **The Wastewater Treatment Plant**

15.     The City operates the MBWWTP, which treats raw sewage for the City of Chattanooga, Tennessee.

16.     WWTPs have two outputs after treatment: (a) water waste, which is discharged by permit to state and federal waters, and (b) solid waste, which is hauled offsite and, if treated sufficiently, can be re-used or land applied (such as on fields/farms) in the form of Class A or Class B biosolids (as regulated by the federal government).

4

17. The City contracted with Synagro to remove and deposit its Class B biosolids at permitted sites, which often means spreading it on fields/farms as fertilizer.

**B.**     **The Contract**

18. In August 2021, the City published a "Request for Sealed Bids—Contract for Biosolids Handling from Moccasin Bend Wastewater Treatment Plant" (Solicitation Number 200044,1) (attached as **Ex. B** and referred to as the "**Contract**"), soliciting an independent contractor to handle the logistics of transporting and land-applying the MBWWTP's predominantly Class B biosolid waste stream.

19. After competitive bidding, the City awarded Synagro the Contract. *See* Ex. B.

20. The Parties set forth additional rights and obligations in a November 10, 2021 Purchase Agreement (PA100046) (**attached as Ex. C**) (the "**Purchase Agreement**").

21. A central tenet of the Contract was for an experienced independent contractor to handle all of the logistics, transportation, siting and spreading of the biosolids produced at the MBWWTP (Ex. A at §1.1):

> Specifically, the City is requesting bids for: The onsite staging, handling and loading of approximately 80,000(±25%) wet tons/year of biosolids at the MBWWTP, site permitting physical and data needs, transportation of Class B biosolids to approved permitted site(s), and the beneficial use of the biosolids in an environmentally acceptable manner such as land application and/or other beneficial use methods. This historically represents 99.9 percent of the total dewatered biosolids production at the MBWWTP.

22. At no point does the Contract provide the City with unilateral veto authority over application of biosolids to an approved site; rather, the Contract places on the independent contractor both the onus of obtaining authorized sites within 75 miles of the MBWWTP and determining the logistics to transport biosolids to pre-approved sites:

### 1.1_B. Biosolids Land Application

5

The Bidder is responsible for locating potential land application sites, securing permission from land owners, preparing site books, soil sampling and analysis and supplying the City with all information necessary to acquire state application permits. The Bidder is also responsible for installing and observing all required setbacks and applying the approved amounts of biosolids at each site. The City will submit the Notice of Intent (NOI) and other documentation to the Tennessee Department of Environment and Conservation (TDEC) and/or the Alabama Department of Environmental Management (ADEM), as required by the Biosolids General Permit.

\*       \*       \*

**1.4_D.1 Offsite Transportation and Handling of Biosolids**
Once released by the laboratory supervisor, the Bidder shall load dewatered and staged biosolids at the MBWWTP site for transportation and handling directly to permitted land application site(s). Weights of loaded biosolids shall meet TDOT weight limits or other state DOT weight limits, as well as product height limits in relation to side boards.

\*       \*       \*

**1.4_E Land Application of Biosolids**
The Bidder shall provide an off-site Field Services Manager who shall be responsible for conducting the day-to-day operations of the Land Application Project. The Field Services Manager shall work with the City's representative to schedule pre-application inspections and shall flag all staging/storage areas and setbacks prior to the commencement of hauling activities.

1. The Bidder shall be responsible for identifying farms for use as biosolids land application sites.

a. Site locations.

(i) The Bidder shall select potential application sites within a 0-75 geographic mile radius of the MBWWTP site.

23.     Although the Contract indicates certain preferences of the City and provides that the City may approve sites at the time of permitting, the Contract does not give the City the unilateral right to approve or reject biosolid loads transported to certain sites on a load-by-load

41850542.3

Case 1:23-cv-00156-TRM-SKL   Document 1   Filed 07/13/23   Page 6 of 26   PageID #: 6

basis, to impose special conditions on loads to certain sites—such as a requirement that the load be spread on the same day—or the right to ban loads from whole counties or sites (for political reasons or otherwise). *See generally* Ex. A at §1.4_E.

24.      In the Contract, the City also promises the contractor the use of the Copperhill Industries site at 304 Ocoee Street, Copperhill, TN 37317 (the "**Copperhill Site**") with the approximate capacity to accept 10 loads per day (amounting to 10,000 Wt/yr or approximately 12.5% of the annual expected biosolids disposition at one location), which the City represented would be available for a significant portion of the four-year Contract period. Ex. B at 1.4_F.

25.      The Contract does not provide the City with a unilateral right to restrict or condition hauling to the Copperhill Site, and there is no legal basis to do so.

26.      Additionally of note, the Contract requires the City to allow Synagro to adjust its price for the if the price of fuel escalates, which has occurred.

> **1.7 Price Adjustment**
>
> Fuel-Related Component. The Contract shall allow the Bidder to adjust the fuel-related component price per ton quarterly by the method listed below: The percentage change the published fuel pricing averages of the weekly published values of the previous month found in the USDOE EIA fuel pricing for the Gulf Coast region. The adjustment in fuel-related component price shall occur on the first day of the quarter.

## B.      The Purchase Agreement.

27.      Shortly after Synagro was awarded the Contract, the Parties entered into the Purchase Agreement (Ex. C).

28.      The Purchase Agreement requires the City to pay invoices within thirty (30) days.

29.      The Purchase Agreement contains a dispute resolution clause mandating that the Parties mediate disputes:

> **14 DISPUTE RESOLUTION**

41850542.3

Claims, disputes, or other matters in question between the parties to this Agreement arising out of or relating to this Agreement, or breach thereof, shall be subject to mediation in Chattanooga, Tennessee, in accordance with the following provisions:

a. The mediation shall be conducted by a mediator mutually acceptable to both parties.

b. The parties agree to share equally in the expense of the mediation.

c. Such mediation may include the Contractor or any other person or entity who may be affected by the subject matter of the dispute.

d. Unless the parties agree otherwise, mediation shall be a condition precedent to the exercise of any legal remedy other than a proceeding seeking an immediate injunction or restraining order to protect the rights of a party pending litigation. Notwithstanding the issuance of an injunction or restraining order, or the refusal of a court to issue such an order, the dispute shall continue to be subject to mediation.

30.     The Purchase Agreement also excuses delays in performance based on circumstances outside of a performing party's control, including the conduct of the other party:

**15 DELAY IN PERFORMANCE**

Neither City nor Contractor shall be considered in default of the Agreement for delays in performance caused by circumstances beyond the reasonable control of the nonconforming party. For purposes of this Agreement, such circumstances include abnormal weather conditions; floods; earthquakes; fire; epidemics; war, riots, or other civil disturbances; sabotage; judicial restraint; discovery of unanticipated hazardous wastes; and inability to procure permits, licenses, or authorizations from any local, state, or federal agency for any of the supplies, materials, accesses, or services required to be provided by either City or Contractor under this Agreement. Should such circumstances occur, the nonconforming party shall, within a reasonable time of being prevented from performing, give written notice to the other party describing the circumstances preventing continued performance and the efforts being made to resume performance of the Agreement. If the Contractor is delayed in the performance of the services for more than three hundred sixty-five (365) calendar days, either by the City or circumstances beyond his control, an equitable adjustment to the contract amount can be made to compensate for additional costs incurred.

## C.     Chattanooga Undermines Synagro's Performance of the Agreement.

31.     The crux of the Contract provides that an experienced biosolids company, like Synagro, be primarily responsible for the logistics, transportation and disposition of Class B

8

biosolids primarily to permitted fields/farms, as well as to the Copperhill Site, within 0-75 miles of the MBWWTP. Ex. B at §1.1.

32.     Synagro depends on its ability to utilize available disposition space when planning its logistics, including procurement of equipment and deployment of human personnel to perform the tasks required by the Contract.

33.     From the first month of the four-year Contract, April 2022, to the present, the City has improperly (i) categorically denied Synagro the use of numerous validly permitted fields/farms and the Copperhill Site, (ii) restricted or conditioned Synagro's right to utilize validly permitted fields/farms by restricting the amount of space Synagro can use and by requiring that biosolids be spread on the same day as delivery, (iii) refused to pay Synagro the fuel adjustment cost even though the price of fuel has increased by more than 50% since the time of the bid; (iv) changed the MBWWTP biosolids storage operation without involving Synagro to address logistics of these changes; and (v) refused to mediate the dispute despite a mediation obligation in the City's own Purchase Agreement.

i.      The City denies Synagro the use of permitted fields/farms and the Copperhill Site

34.     The Contract provides that Synagro undertake the permitting and transport to fields/farms within a 75 mile radius of the MBWWTP.

35.     The Contract also provides Synagro with the long-term use of the Copperhill Site for approximately 10 loads of biosolids per day.

36.     For political or other reasons beyond the scope of the City's rights under the Contract, at times, the City has categorically denied and/or unduly restricted or conditioned Synagro's commercially reasonable use of validly permitted fields/farms.

41850542.3

37.     As of the writing of this Complaint, the City has imposed the following unilateral restrictions beyond its rights in law or Contract:

a.  **Van Buren County**—

   i.  After a public meeting in Van Buren County, the City asked Synagro to leave the County as soon as possible and not to go back. When Synagro pushed back, and was turned down, the City pushed it to use Warren County

   ii.  Once the second application crew equipment arrived and they got started, the City allowed Synagro to use only three fields/farms (TNVB101, 102 and 103) in Van Buren County because the sites are just over the Warren County line and all in one location.

   iii.  The City imposes the additional non-regulatory and non-contractual condition that all biosolids going to sites in Van Buren County must be spread the same day they arrive.

   iv.  The City prevents Synagro from using all other validly permitted sites Van Buren County even though such Sites are within a 75 mile radius of the MBWWTP, as provided for in the Contract.

   v.  Within 75 miles of the MBWWTP, Synagro has 22 validly permitted fields/farms in Van Buren County with an acreage of 5,890 and capacity to handle 70,684 WT/year.

b.  **Warren County**—

   i.  Although the City has demanded that Synagro use Warren County, the City imposes the non-regulatory and non-contractual condition that Synagro must spread biosolids the same day they arrive.

ii. Within 75 miles of the MBWWTP, Synagro has 7 validly permitted fields/farms in Warren County with an acreage of 968.9 and capacity to handle 11,842.8 WT/year.

c. **Bledsoe County**—certain already permitted and accepted sites are being rejected by the City on a case-by-case basis as "sensitive" sites, meaning Synagro is not allowed to use those sites. Synagro has asked on multiple occasions for the City to provide a list of those sites so Synagro could attempt to plan around them, and the City has refused to provide a list, rejecting sites outright on a request-by-request basis. Within 75 miles of the MBWWTP, Synagro has 32 validly permitted fields/farms in Bledsoe County with an acreage of 3,049.7 and capacity to handle 35,596.4 WT/year.

d. **Hamilton County**—

i. The City told Synagro verbally not to go into Hamilton County because of public and media issues. The City even asked Synagro to ignore a farmer that kept calling the City wanting material taken to his farm in Hamilton County.

ii. Although the City has changed its position and now allows Synagro to use Hamilton County, it imposes the undue restriction that Synagro must spread biosolids on the same day they arrive.

iii. Within 75 miles of the MBWWTP, Synagro has 21 validly permitted fields/farms in Hamilton County with an acreage of 2,420 and capacity to handle 29,041 WT/year.

11

38.     The undue loss or restrictions on fields/farms in each of these Counties constitutes 42% of the total number of fields/farms available to Synagro within a 75 mile radius of the MBWWTP, and substantially increases logistical complications and associated costs to Synagro.

39.     In addition, the City has denied Synagro all use of the Copperhill Site, even though, upon information and belief, the Copperhill Site is available to accept biosolids.

40.     The City represented the Copperhill Site as being available to take 10 loads per day or approximately 10,000 WT/year, and the Contract provides no provision for the City to unilaterally deny its use when legally permitted and available for Synagro's use.  *See* Ex. B at § 1.4_F.

41.     Consistent use of the Copperhill Site for 10 loads per day would significantly simplify Synagro's logistics, and loss of this location substantially increases its incremental costs for personnel and equipment above that reasonably anticipated under the Contract.

> ii.     The City imposes non-legal, non-Contractual conditions on duly authorized fields/farms.

42.     Synagro has a Contractual obligation to flag fields/farms prior to biosolids application, which it does, to ensure that field application complies with applicable laws and regulations.

43.     The City has the right to approve the flagging for consistency with applicable laws and regulations.  Ex. B at §1.4_A.3.

44.     The City, and specifically its biosolids coordinator Ms. Styers, have continuously imposed undue requirements on Synagro that are outside of the Contract, are not required by applicable regulations, and severely limit Synagro's use of fields/farms and obstruct Synagro's ability to perform.

41850542.3

45.     When Ms. Styers inspects fields/farms for flagging, she imposes her own rules to hinder Synagro's performance of the Contract and on some occasions lobbies the Tennessee Department of Environmental & Conservation to agree with idiosyncratic and incorrect setback laws and regulations in an effort to obstruct Synagro.

46.     When Synagro employees contest her view or even that of a TDEC inspector aligning with her idiosyncratic view, she becomes abusive and hostile.

47.     In late 2022 and early 2023 (and specifically on February 14, 2023), after a Synagro employee questioned the validity of flagging setbacks, Ms. Styers twice threatened a Synagro manager that if Synagro did not fire the employee that contested her, she would personally see to it that Synagro would be fired from handling the City's biosolids (despite having three years left on its Contract).

48.     Ms. Styers also has demanded since the very beginning of Synagro's Contract that it hire a particular employee of the prior biosolids contractor and friend of hers for the same position as the Synagro employee that she sought to be fired.

49.     Ms. Styers conduct was so inappropriate and problematic that Synagro wrote the City requesting that she be replaced as their liaison.

50.     Although the City failed to respond directly to Synagro, it assigned a supervisor over Ms. Styers.  Only two weeks later, however, the supervisor informed Synagro that she was stepping back to an "advisory" role, and Ms. Styers immediately reasserted herself and continues to this day to intentionally create obstacles to Synagro's performance under the Contract.

51.     Upon information and belief, Synagro believes that Ms. Styers fully intends to make good on her threat and is looking for ways to prevent Synagro from performance so she can replace Synagro with a contractor of her choosing.

41850542.3

52.     In addition to arbitrarily limiting the scope of field usage, the City imposes non-legal, non-regulatory and non-Contractual conditions on the time Synagro has to spread on fields/farms.

53.     The Contract requires that Synagro manage the transport and spreading of the biosolids process and provide the staff and logistics for the same.

54.     Synagro undertakes the commercially reasonable practice of delivering biosolids to fields/farms with one crew on one particular day, then working with the farmers crop and harvesting schedules to find an appropriate time to spread the biosolids on the fields/farms.

55.     This practice is commercially reasonable because Synagro needs the capacity to remove and stage the biosolids at a given Site but only spread them when it is convenient for the farmer (based on the farmer's crop and work needs).

56.     By improperly conditioning Synagro's use of validly permitted fields/farms on spreading the biosolid the same day as they are delivered, the City substantially limits the fields/farms available to Synagro for logistical reasons and forces Synagro to incur substantial incremental costs well above those that could be reasonably expected under the terms of the Contract and Purchase Agreement.

57.     Despite having no obligation to do so, Synagro has purchased additional equipment and attempted to meet this customer-driven non-Contractual demand, but no matter what Synagro does the City changes the rules or imposes new conditions.

58.     As a result of the City's additional arbitrary conditions—both as to the space allowed to be flagged for use in a given field and the time for spreading—Synagro is prevented from using its commercially reasonable judgment and logistical expertise to allocate resources, obstructing it entirely from receiving any benefit of the bargain of the Contract.

41850542.3

<u>iii.    The City denies Synagro's right to a fuel price adjustment.</u>

59.    The Contract provides Synagro the right to adjust price based on the price of fuel.

60.    Within one year of the bid date, fuel prices had increased by 50%.

61.    In October 2022, Synagro noticed that it had not applied the fuel adjustments to 2022 invoices and notified the City.

62.    Ms. Styers outright refused to cooperate saying "bill it like you bid it."

63.    Although the City has paid 2023 invoices with the fuel adjustment applied, the City continues to refuse to pay corrected 2022 invoices.

64.    Synagro's application of the fuel adjustment, together with a spreadsheet showing the amount due and owing, is reflected in the January 11, 2023 letter attached to this pleading as **Exhibit D** and incorporated as if fully set forth herein.

65.    As set forth in **Figure 3** on **Exhibit D**, the City owes Synagro $222,181.95 in unpaid fees based on the fuel adjustment provision of the Contract.

<u>iv.    The City modifies the MBWWTP biosolids staging operations without coordinating with Synagro.</u>

66.    The Contract provides that Synagro will remove biosolids from the staging pad at the storage plant within three days.

67.    The MBWWTP built a new scale house and designed a new traffic pattern that cut the storage pad in half, which went into effect in May 2023.

68.    Although the City did not involve Synagro in this material change to its facility, it now complains that the pad is full and sends Synagro non-compliance letters, even though Synagro planned its logistics based on the MBWWTP's storage capacity at Contract signing.

69.    Relatedly, the MBWWTP is supposed to have two loadout conveyers, but because the City is replacing one of the conveyers, only one conveyer has been in operation for several

15

months.  Having two loadout conveyers is vital because it allows two trailers to sit parallel, and plant operators can switch from a full to empty trailer without stopping production or causing biosolids to fall back into the loading area.  Once again, and par for the course with the City's administration of this Contract, the City has accused Synagro of not providing enough equipment or "making a mess" when the circumstances reflect the unilateral decisions of the City.

v.      The City refuses to mediate.

70.     The City's form Purchase Agreement requires the Parties to mediate.

71.     Synagro wrote the City on multiple occasions framing the dispute and ultimately demanded mediation in June 2023 to resolve disputed matters.

72.     The City categorically denied Synagro's mediation request. Ex. A.

73.     In so doing, the City directly violated the terms of its own Purchase Agreement, costing Synagro significant time and attorney's' fees to litigate and demonstrating the disparity between the manner in which the City administers the Contract and the text of its own agreements.

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract
(the City)

74.     Synagro repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

75.     Chattanooga awarded Synagro the Contract on terms contained in the RFP (Ex. B).

76.     Synagro and Chattanooga entered into a subsequent valid and binding Purchase Order dated November 11, 2023 (Ex. C).

77.     The Contract provides that Synagro, as an independent contractor and not an employee of the City, shall handle the logistics involving the transportation and disposition of

16

biosolids, including the permitting and use of farm fields/farms within a 75-mile radius of the MBWWTP.

78.     Although the Contract provides the City the right to approve fields/farms for permitting, the Contract does not give the City the right to unduly deny the use of, or impose non-legal or non-regulatory conditions on, already-permitted fields/farms.

79.     The City likewise agreed to provide Synagro with the use of the Copperhill Site for biosolid disposition, and the City unilaterally removed that Site from Synagro's use even though the Copperhill Site remains legally available for biosolids delivery.

80.     The Contract requires that Synagro spread on fields/farms, but does not give the City the right to impose non-legal, non-regulatory and non-contractual conditions, such as limiting the use of the available space within a field through arbitrary flagging opinions

81.     The Contract requires that Synagro deliver to fields/farms and spread the biosolids, but it does not give the City the authority to impose the condition that if Synagro wishes to use a field in a particular county it must spread the fields/farms on the same day the delivery is made.

82.     The Contract requires the City to pay Synagro a fuel adjustment based on rising fuel prices.

83.     The City breached the Contract by denying Synagro the right to spread on permitted fields/farms within 75 miles of the MBWWTP and by otherwise preventing Synagro from using its knowledge, training and experience to handle the logistics, transportation (including both equipment and personnel) and disposition of Class B biosolids. Ex. B at §1.1.

84.     The City breached the Contract by denying Synagro the use of the Copperhill Site without legal, regulatory or contractual basis for doing so.

41850542.3

85.     The City breached the Contract by preventing Synagro from spreading biosolids to the full capacity of any permitted field, without legal, regulatory or contractual basis for doing so.

86.     The City breached the Contract by requiring Synagro to spread biosolids the same day if it wishes to use certain counties, without legal, regulatory or contractual basis for doing so.

87.     The City breached the Contract by refusing to pay Synagro the contractually allowed fuel price adjustment during the year 2022, which was invoiced and is validly due and owing, as set forth in Exhibit D.

88.     The City breached the agreement by materially modifying the MBWWTP biosolids transfer area by reducing the storage pad by half and taking a loader out of operation and then blaming Synagro for the logistical issues caused by these decisions.

89.     The City also breached its own Purchase Agreement by outright refusing to mediate these various disputes with Synagro.

90.     Even though the Contract is written for an outside contractor to manage all of the logistics of the biosolids transportation and disposition process, the City and its biosolids manager's administration of the Contract obstructs Synagro from using its judgment regarding deployment of resources, frustrates the efficient deployment of resources and otherwise violates the central tenant of the Contract and prevents Synagro from receiving any benefit of the bargain. The City's conduct prevents Synagro from acting as an independent contractor using its knowledge, training and experience to efficiently deploy its equipment and personnel.

91.     As a result of the City's breaches and undue administration of the Contract, Synagro has suffered monetary damages, including in the form of the unpaid fuel surcharge, as well as incremental costs significantly exceeding those it would incur if the City did not impose upon it

18

unilateral, non-legal, non-regulatory and non-contractual restrictions and conditions that increase significantly the costs of equipment and manpower.

WHEREFORE, Plaintiff, Synagro prays as follows:

(a)     Issuance of process against the City of Chattanooga;

(b)     Service of process and that an answer to the Complaint be filed within the time required by law;

(c)     Judgment against the City for monetary damages and restitution in excess of $75,000 plus interest, including money damages for failure to pay the fuel surcharge and for the incremental cost to Synagro (over and above the cost Synagro would reasonably incur to perform under the Contract) to adjust operations to address the City's unreasonable demands and conduct, including the City's imposition of non-legal, non-regulatory and non-contractual conditions, as well as material plant modifications;

(d)     Injunctive relief mandating that the City allow Synagro to use all validly permitted or available sites within 75 miles of the MBWWTP (or beyond 75 miles by additional agreement with the City), as well as the Copperhill Site, without condition or exception, except to the extent that such condition or exception is imposed by a duly enacted, enforceable (and not preempted) law or regulation or is contained as an express term of the Contract or Purchase Agreement;

(e)     Declaratory relief affirming that the Contract requires the City to allow Synagro to use all validly permitted or available sites within 75 miles of the MBWWTP (or beyond 75 miles by additional agreement with the City), as well as the Copperhill Site, without condition or exception, except to the extent that such condition or exception is imposed by a duly enacted, enforceable (and not preempted) law or regulation or is contained as an express term of the Contract or Purchase Agreement;

41850542.3

(f)     Declaratory relief affirming that the City lacks the unilateral right to force Synagro to take any action, to prevent Synagro from taking any action or from imposing conditions on Synagro's actions, unless required by duly enacted (and not preempted) law, regulation or an express term of the Contract or Purchase Agreement;

(g)     Declaratory relief affirming that the City lacks legal or Contractual authority to deny or condition hauling on a site-by-site basis or to categorically restrict or condition Synagro's hauling to whole counties or groups of sites for any reason, including political reasons;

(h)     Declaratory relief affirming that the Contract requires the City to discuss any changes to the biosolids operation at the MBWWTP with Synagro prior to such changes going in effect and that the Contract requires the City to consider change orders submitted by Synagro and/or otherwise undertake mediation if a dispute arises; and

(i)     Such other relief as the Court deems just and appropriate.

## COUNT TWO
### Breach of Contract – Breach of Implied Covenant of Good Faith and Fair Dealing
(the City)

92.     Synagro repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

93.     Chattanooga awarded Synagro the Contract on terms contained in the RFP (Ex. B).

94.     Synagro and Chattanooga entered into a subsequent valid and binding Purchase Order on November 10, 2021 (Ex. C).

95.     The common law of Tennessee imposes a duty of good faith and fair dealing in contracts, and implicit within this duty is the concept of reasonableness. 395 S.W.3d 653 (Tenn. 2013).

20

96.     Explicit and Implicit in the Contract is the principal that a independent contractor with experience manage the removal of biosolids from the MBWWTP and deposit them consistent with federal, state and local law.  The Contract places the onus of permitting and logistics of this operation on the contractor and gives the Contractor authority to deploy resources as it sees fit within these general parameters.

97.     Synagro was selected to perform this service.

98.     From the inception of this arrangement, however, the City's biosolids coordinator, Ms. Styers, has micromanaged the process to such a degree that Synagro cannot effectively or reasonably perform the duties it has been hired to perform.

99.     The City and Ms. Styers have, at times, prevented Synagro from hauling to numerous counties divesting them of approximately 40% of the permitted sites available.

100.    The City and Ms. Styers have imposed non-legal, non-regulatory and non-contractual restriction both on which fields/farms Synagro uses, how much field Synagro can use and when Synagro must apply biosolids to the fields/farms.

101.    When Synagro asked for the fuel adjustment, Ms. Styers denied it, then delayed payment of 2023 invoices with the adjustment, and the City still has not paid the fuel adjustment for 2022.

102.    The City has materially modified the MBWWTP biosolids transfer area by reducing the storage pad by half and taking a loader out of operation then blamed Synagro for the logistical issues caused by these decisions.

103.    The City refuses to mediate even though its an express provision of their Purchase Agreement

41850542.3

104. At every turn, the City's behavior, and particularly that of Ms. Styers, has systematically undermined and sabotaged the performance of Synagro's Contract, denying and obstructing Synagro from receiving any benefit of the bargain.

105. Upon information and belief, the City has undertaken these actions for political, non-legal reasons, and upon information and belief City employee Ms. Styers is actively working to disrupt Synagro from performing its services, having threatened that she would personally see to it that Synagro was fired from the Contract because a Synagro employee stood up to her and Synagro did not fire that employee.

106. The City's behavior taken as a whole and as set forth throughout this Complaint, directly violates the covenant of good faith and fair dealing, which applies to every contract in Tennessee.

WHEREFORE, Plaintiff, Synagro prays as follows:

(a) Issuance of process against the City of Chattanooga;

(b) Service of process and that an answer to the Complaint be filed within the time required by law;

(c) Judgment against the City for monetary damages and restitution in excess of $75,000 plus interest, including money damages for failure to pay the fuel surcharge and for the incremental cost to Synagro (over and above the cost Synagro would reasonably incur to perform under the Contract) to adjust operations to address the City's unreasonable demands and conduct, including the City's imposition of non-legal, non-regulatory and non-contractual conditions, as well as material plant modifications;

(d) Injunctive relief mandating that the City allow Synagro to use all validly permitted or available sites within 75 miles of the MBWWTP (or beyond 75 miles by additional agreement

with the City), as well as the Copperhill Site, without condition or exception, except to the extent that such condition or exception is imposed by a duly enacted, enforceable (and not preempted) law or regulation or is contained as an express term of the Contract or Purchase Agreement;

(e)     Declaratory relief affirming that the Contract requires the City to allow Synagro to use all validly permitted or available sites within 75 miles of the MBWWTP (or beyond 75 miles by additional agreement with the City), as well as the Copperhill Site, without condition or exception, except to the extent that such condition or exception is imposed by a duly enacted, enforceable (and not preempted) law or regulation or is contained as an express term of the Contract or Purchase Agreement;

(f)     Declaratory relief affirming that the City lacks the unilateral right to force Synagro to take any action, to prevent Synagro from taking any action or from imposing conditions on Synagro's actions, unless required by duly enacted (and not preempted) law, regulation or an express term of the Contract or Purchase Agreement;

(g)     Declaratory relief affirming that the City lacks legal or Contractual authority to deny or condition hauling on a site-by-site basis or to categorically restrict or condition Synagro's hauling to whole counties or groups of sites for any reason, including political reasons;

(h)     Declaratory relief affirming that the Contract requires the City to discuss any changes to the biosolids operation at the MBWWTP with Synagro prior to such changes going in effect and that the Contract requires the City to consider change orders submitted by Synagro and/or otherwise undertake mediation if a dispute arises and

(g) Such other relief as the Court deems just and appropriate.

41850542.3

## COUNT THREE
## <u>Tortious Interference with Contractual Relations</u>
(Karen Styers)

107.    Synagro repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

108.    Ms. Styers is the biosolids manager for the City.

109.    Ms. Styers has knowledge that Synagro was awarded the Contract and that a legal contract existed and exists.

110.    Ms. Styers intended, and upon information and belief, still intends to induce a breach of the Contract through her administration of the Contract, her abusive behavior, her arbitrary demands and because she said she intended to do that.

111.    From the start of Synagro's Contract, Ms. Styers has attempted to force it to hire a friend of hers from the former service provider and Synagro refused.

112.    Ms. Styers acted with malice and outside of the course and scope of her employment with the intent to replace Synagro with a contractor of her choosing and retaliating against Synagro for not hiring a friend of hers.

113.    Ms. Styers has demanded that Synagro fire its employee who holds the position that her friend would fill, and she has told Synagro that she would get Synagro "fired" from the Contract with the City for refusing to fire its employee in that position.

114.    Although Synagro has not breached the Contract, the City has notified Synagro of non-compliance, and those challenges connect directly from the behavior and actions of Ms. Styers, who constantly changes the rules, fails to include Synagro in key conversations or decisions impacting biosolids under the Contract, abuses and threatens Synagro for personal gain and to induce non-compliance.

41850542.3

115. Synagro notified the City about Ms. Styers' aggressive and abusive behavior and the City insufficiently responded. The City placed supervision over Ms. Styers for only two weeks, but then allowed her to reassert herself and resume her mission of "firing" Synagro from the Contract and otherwise inducing Synagro's non-compliance with the Contract.

116. To the extent Synagro loses the Contract of the City or otherwise suffers damages as otherwise set forth herein, such damages are directly and proximately caused by the intentional, malicious and self-motivated behavior of Ms. Styers.

WHEREFORE, Synagro prays as follows:

(a)     Issuance of process against Ms. Styers;

(b)     Service of process and that an answer to the Complaint be filed within the time required by law;

(c)     Judgment against for monetary relief, including attorney's fees, costs and lost profits, in an amount equal to any loss of any Contract privilege with the City, which is in excess of $75,000;

(b)     Injunction preventing Karen Styers from having any further role in the administration of the Contract or any relationship between the City and Synagro; and

(c)     Such other relief as the Court deems just and appropriate.

41850542.3

Respectfully submitted,

**PATRICK, BEARD, SCHULMAN & JACOWAY, P.C.**

By:      /s/Robert W. Wheeler
         Steven M. Jacoway, TN BPR #012129
         Robert W. Wheeler, TN BPR #034485
         537 Market Street, Suite 300
         Chattanooga, Tennessee 37402
         Telephone: (423) 756-7117
         Facsimile: (423) 267-5032
         sjacoway@pbsjlaw.com
         rwheeler@pbsjlaw.com

26